**EXHIBIT "14"**

# IN THE TOLEDO MUNICIPAL COURT, LUCAS COUNTY, OHIO

State of Ohio,      *      Case No. CRB-08-25138

    Plaintiff,      *

vs.      *      OPINION

Robert Dubish,      *

    Defendant.      *      **Judge Francis X. Gorman**

     *

Defendant is charged with two violations of Ohio law, Operating a Gambling House, a violation of Section 2915.03(A)(1) of the Ohio Revised Code and Gambling, a violation of Section 2915.02(A)(2) of the Ohio Revised Code.

The Defendant, a resident of Warren, Michigan, operates a business known as the Players Club Café at 218 Main Street in Toledo, Ohio. It is this business that is the subject of these criminal charges; however, and it is relevant to this case, the Defendant also maintains a grocery store next to the Players Club Café. On December 8, 2008, Detective Kenneth DeWitt of the Toledo Police Department's Vice and Narcotics Unit was dispatched to the Defendant's Players Club Café to investigate allegations that it was a gambling operation. He entered the premises and purchased a $50.00 card. His picture was taken and other information, along with the picture, was affixed to the card. During the trial, the Detective referred to this card as a "game card." Detective DeWitt then took the card to one of the seventy or so computers on which, after swiping his card, he was able to play any number of computer-generated games. Although



**EXHIBIT 14**

Detective DeWitt testified that he won $4.00 as a result, in actuality he won $54.00 for which he was paid at the window where he purchased the card, following his exhaustion of game entries. Based on this activity, the Detective then filed the instant criminal charges.

The server which serviced all of the computers was seized by the Toledo Police Department and has been held up to the date of the trial. It is important to note that since the day of the filing of the charges, the premises remained intact.

During the course of the trial to the Court, the Court, the Prosecutor, the Detective, the Defendant, the Defense Lawyer, and court staff, including the Court Reporter, toured the Players Club Café and had the opportunity to observe the premises, as well as a demonstration by the Defendant of the operation of the Players Club Café. The Defendant operated a computer-generated game for the benefit of the Court.

Defendant's premises consists of one large room with seventy or so computers, along with certain soft drink facilities. Upon entering the premises, a customer proceeds to a back window at which a large sign is present. As the Detective indicated, upon purchase of a "card" the customer can then, should he wish, proceed to a computer and play the computer-generated games. However, to conclude that this is all that occurs at the Players Club Café is both simplistic and misleading.

The evidence indicated, both visually and with the testimony of the Defendant, that what really occurs upon entering the premises is that a customer

2

proceeds to the back window to purchase a card. This large sign, a photograph of which was admitted into evidence, indicates that the person is purchasing a $5.00, $10.00, $15.00, $20.00 or $50.00 telephone card. Upon cross-examination, the police officer, when examining his "game card," became aware that on the back of the card it was indicated that it was a phone card which allowed him to use it for an unlimited period of time, but that once he began its use the card would expire within three months. Moreover, this sign in the Defendant's premises indicated to the customer that the games were a sweepstakes and that customers could, every twenty-four hours, play the sweepstakes games for free without purchase. The sign also indicated that if a customer did not wish to play the computer-generated games, he could ask the attendant to "swipe" his card at that point and that the swiping of the card would indicate whether or not the customer had won any prize in the sweepstakes.

The Defendant testified, and his sign clearly indicated, that the outcome of the sweepstakes winners was predetermined by the operation of the computer. Detective DeWitt could have asked the operator to swipe his card and, at that point, Detective DeWitt would have learned that he had won the $54.00.

This is not to say that Detective DeWitt was being untruthful in his testimony. In fact, the evidence in this case is not in dispute. Detective DeWitt, to his credit, testified that when he entered the premises he was looking for a gambling operation and perhaps did not spend the time reading this rather involved sign. Detective DeWitt also indicated that when he played the games

he did not realize or recognize that the same rules were printed on the computer screen.

And, while perhaps not crucial to the outcome of this trial, the Defendant testified that in the course of the business he purchased the phone card time in bulk from a Canadian corporation. He also testified that, not surprisingly, many of his customers did not use all of the time on the phone card after exiting the premises so that the Defendant then could, at a later time, resell that unused time which, of course, increased his profitability in the sale of the phone cards. The defense pointed out, correctly, that while the purchase of a phone card permitted the customer to either have his card swiped, play the games, or exit without doing either, in any event, the customer retained the phone card minutes purchased. Regardless of the outcome of playing the games, swiping of the card, or neither, the customer got what he paid for – the phone card.

The Defendant testified during the course of the trial that his entire operation was a marketing tool intended to draw customers into the establishment to purchase a phone card to play games. He testified, and there is no dispute to his testimony, that his entire profit came from the sale of the phone cards.

It is also instructive to note that at the Defendant's grocery store next door, of which the entire inventory of the grocery store was supplied by Spartan Stores of Michigan, Defendant had a kiosk of phone cards for sale. The Defendant testified, and it is hardly surprising, that while these phone cards were worth the approximate same value as the ones sold in the Players Club Café, the

sales at the Players Club Café far outweighed the sales of phone cards in his grocery store.

In summary, the evidence in this case is not in dispute. The Court is not called upon to resolve issues of fact. Rather, both the prosecution and the defense lay out arguments as to how these facts should be interpreted in light of the existing Ohio law.

## THE LAW

### RC 2915.02(A)(2): Gambling.

No person shall do any of the following: Establish, promote, or operate or knowingly engage in conduct that facilitates any game of chance conducted for profit or any scheme of chance.

### RC 2915.03(A)(1): Operating a gambling house.

No person, being the owner or lessee, or having custody, control, or supervision of premises, shall: Use or occupy such premises for gambling in violation of Section 2915.02 of the Revised Code.

### RC 2915.01(E): Game of chance conducted for profit.

Means any game of chance designed to produce income for the person who conducts or operates the game of chance, but does not include bingo.

### RC 2915.01(D): Game of chance.

Means poker, craps, roulette, or other game in which a player gives anything of value in hope of gain, the outcome of which is determined largely by chance, but does not include bingo.

RC 2915.01 (C): Scheme of chance.

Means a slot machine, lottery, numbers game, pool conducted for profit, or other scheme in which a participant gives a valuable consideration for a chance to win a prize, but does not include bingo, a skill-based amusement machine, or a pool not conducted for profit.

RC 2915.01(VV): Slot machine.

(1) Means either of the following: (a) Any mechanical, electronic, video, or digital device that is capable of accepting anything of value, directly or indirectly, from or on behalf of a player who gives the thing of value in the hope of gain; (b) Any mechanical, electronic, video, or digital device that is capable of accepting anything of value, directly or indirectly, from or on behalf of a player to conduct or dispense bingo or a scheme or game of chance.

The State argues that the conclusion to be drawn from the evidence is that the Defendant is promoting a scheme of chance and its argument is well summed up in the State's post-hearing brief:

> "A phone card sweepstakes such as the Defendant's is really nothing more than 'scheme of chance' as defined in Revised Code 2915.01(C). Ohio courts have consistently looked to the predominate purpose of the game, rather than its face, in determining whether the game is a true sweepstakes or scheme of chance. When presented with the argument that consumers are giving consideration for only the phone card, courts have held that it is obvious the consumers are interested in potential monetary prizes and not the phone card. The phone card, in essence, is just a sham to entice customers into the establishment."

To bolster its argument, the State relies on a series of cases that all originate with an initial decision in Katmandu, Inc. v. Liquor Control Commission (2002) Franklin App. No. 01CVF10-10134, unreported, and affirmed by the Tenth District Court of Appeals. Katmandu, Inc. v. Liquor Control Commission (2002), 2002-Ohio-6743. As the prosecution notes, the Court of Appeals found "We can find no error in the common pleas court's determination that the phone card portion of the ticket was of slight value and that *the predominate purpose of operating the machine was to play a scheme or game of chance*"

In Katmandu, supra, the alleged gambling device was a "Lucky Shamrock Emergency Phone Card Dispenser" which would accept money and dispense a two-minute long-distance phone card with attached sweepstake game pieces. Winning tickets were predetermined and the machine would recognize the winning ticket and would light up and present an award if the customer was deemed to be a winner. While obviously this case and the subsequent cases relying on Katmandu are clearly relevant to this Court, unfortunately Katmandu does not address the issue to be decided by this Court, for in Katmandu the defendant stipulated to the admissibility of the Liquor Control Commission's investigating officer's report. That report indicated that the machine was a gambling device that allowed persons to play "schemes of chance on a video screen." Inasmuch as the defendant stipulated that the machine was a game of chance, the trial court was not called upon to determine whether or not the machine was a game of chance. The Court of Appeals correctly noted that it is not the role of an appellate court to examine the evidence. In this case, the

Defendant vehemently denies that his operation involves a scheme or game of chance. His operation is, of course, different than Katmandu. The fact that it is different than Katmandu does not necessarily lead the Court to conclude that it is not a game of chance. However, his denial does require the Court to make that determination.

At this point, it should also be noted that Katmandu, as well as the cases relying on it, was civil in nature as opposed to the instant case. Obviously, the standard of proof is far different in the two scenarios.

These courts, moreover, have concluded that the proper test to be utilized, the "predominate purpose of the machines," is the legal test that this Court should utilize. Indeed in Flare Game Technology, Inc. and Mid-Ohio Vending v. the Ohio Department of Public Safety (2003), 10th App. Dist. No. 02AP-748, the commission argued that the fact that a machine has an innocent use in dispensing phone cards does not prevent a trial court from concluding that the appellant's intention is to operate an illegal gambling device. This rather startling assertion may have some use in a civil case; however, this Court is addressing an alleged violation of Ohio criminal law.

In conclusion, the State argues that the Defendant's operation at the Players Club Café is a ruse; that the sales of the phone cards, as the Liquor Commission noted in Katmandu, were of little value; that the real and overall purpose of the operation was to entice people in to play games of chance and that, therefore, the Defendant has violated the Ohio gambling laws.

However, in order to have this Court conclude beyond a reasonable doubt that the Defendant violated the Ohio gambling laws, the State must overcome serious obstacles to their own argument. First of all, while the Katmandu decision says that the phone cards purchased in those cases were of little value, the evidence in this case would indicate otherwise. The Defendant sells these phone cards in the Players Club Café, but it is equally true that he sells the same value cards in his grocery store adjacent to the Players Club Café. No evidence was presented to suggest that the phone cards sold in Defendant's grocery store were of no value. Inasmuch as the cards were essentially identical, the Court can conclude that the phone cards sold at the Players Club Café by the Defendant were of equal value. And, while not evidence in this case, the Court notes that it recently was at an Ohio turnpike plaza where all of the goods and services available there are licensed by the Ohio Turnpike Commission, and the Court notes that in the foyer was a telephone card machine which dispensed cards similar in nature to the cards involved here. One would hope that the Ohio Turnpike Commission would not license products to be sold of little or no value.

In short, the Court finds that the cards sold by the Defendant gave to the purchaser telephone cards that were available to the public by other retail sellers and are of the same or similar value.

The Defendant argues that there are three elements to a charge involving gambling, "Consideration -- Risk -- Reward." As The Supreme Court noted in Federal Communications Commission v. American Broadcasting Co., 347 U.S. 284 (1954), "A prohibited lottery, or gambling, is the union of chance, prize and

4

consideration. Remove any of these elements and there is no gamble." This is the threshold test.

Consideration. While clearly the customer, upon entering the Players Club Café, purchases a phone card for a predetermined amount of money, $5.00, $10.00, $20.00, etc., it should be noted, however, and is clearly indicated on Defendant's premises, that one can enter the sweepstakes without the purchase of a phone card. The evidence clearly establishes that once the individual purchases such a card he retains what he purchased whether or not he chooses to enter the computer-generated games. Simply put, the value of the card is never at risk

Risk. As evidenced in the above paragraph, there is no risk to the purchaser of the phone card in losing the value of his purchase. He can play the computer-generated games, have the card swiped to determine whether or not he won a prize, that prize having already been predetermined by computer, or he could simply leave the premises with the phone card.

Reward. Defendant concedes in his post-hearing brief that there is a reward and the evidence would clearly indicate that there is a possibility of a reward as evidenced by Detective DeWitt's winning of $54.00 upon playing the computer-generated game.

The Defendant testified at the trial that his entire profit from the operation of the Players Club Café came from the sale of the aforementioned phone cards. The State did not challenge that assertion; instead it argues that the Court should look at the predominate purpose of the operation and the State argues

10

that the sale of the phone card was nothing more than a ruse to entice the purchaser of a card to play the machine. Defendant counters that the computer-generated game is a marketing tool intended to increase the sale of phone cards. He testified that the sale of the phone cards at the Players Club Café drastically exceeded the sale of the phone cards from the kiosk in his grocery store.

The Court is somewhat mystified at the "predominate purpose of the machines" argument inasmuch as the State asserts that it is an essential element of the crime. Even if it was, which it is not, the Defendant's argument is rather persuasive that the predominate purpose of the machines is to encourage the purchase of the phone cards, a clever and apparently profitable marketing tool. And while not controlling in this state, the Massachusetts Supreme Court in Mobil Oil Corporation v. Attorney General, 361 Mass. 401 at 407 (1972), observed "The incidental increase in business attendant upon the use of promotional games...is not the type of consideration necessary to make [such] games lotteries." In other words, the fact that this Defendant has developed a clever promotional device to increase the sale of phone cards is not evidence of a gambling operation. Again, gambling is the union of chance, prize and consideration. Remove any of these elements and there is no gamble. Federal Communications Commission v. American Broadcasting, supra. Clearly in this case, the element of risk is not present. The element of consideration is present, but it is not coupled with risk. In other words, once the card is purchased the customer owns the phone card, as does the customer of a phone card purchased at the grocery kiosk or at the turnpike plaza. And, as the Defendant stipulated, the

element of reward is, of course, present. As the Defendant asserts, he has to offer a reward in order to influence the customer to purchase a phone card and, while not determinative here, it should be kept in mind that a person entering the Players Club Café can play the computer-generated promotional sweepstakes games without the purchase of a phone card.

Nevertheless, the State argues that we must look at the grand scheme, because all of the elements of gambling are simply not present. This Court is reminded of a decision in A.P. Herbert's wonderful book Uncommon Law, Methuen & Co. Ltd. London 1933. This classic collection is of fictional English decisions which, at times, have great relevance to current court matters. Mr. Herbert's case is Rex v. Haddock, (subtitled "Is it a Free Country?") in which the defendant, on a dare, jumped into the Thames river from a bridge in London. The police, unsure of his conduct, charged him with (a) Causing an obstruction, (b) Being drunk and disorderly, (c) Attempting to commit suicide, (d) Conducting the business of a street bookmaker, (e) (Under the Navigation Acts) endangering the lives of mariners; (f) (Under the Port of London Authority By-laws) interfering with an authorized regatta. This decision is relevant here only to the extent of the next paragraph in the decision.

> "It may be said at once that in any case no blame whatever attaches to the persons responsible for the framing of these charges, who were placed in a most difficult position by the appellant's unfortunate act. It is a principle of English law that a person who appears in a police court has done something undesirable, and citizens who take it upon themselves to do unusual actions which attract the attention of the police should be careful to bring these actions into one of the recognized categories of crimes and offences, for it is intolerable that the police should be put to the pains of inventing reasons for finding them undesirable."

12

It is that paragraph which this Court finds similar sympathies with the argument of the State. The Defendant's conduct in the instant case simply does not fall within the guidelines of the violations of the Ohio gambling laws and the State, here, like the prosecution in Haddock, is suggesting that the Court look beyond those elements. This the Court cannot do. The Defendant's operation simply does not violate the Ohio gambling laws.

## Findings of Fact

1. The Defendant owns and operates the Players Club Café, in which participants purchase phone cards and as a result of those purchases can play computer-generated games at which there is a possibility that they could win a predetermined prize.

2. If the purchaser does not wish to play a game, he can have the card swiped at the purchase counter to determine whether or not he has won a predetermined prize.

3. Or, the purchaser can merely leave with the phone card.

4. The phone card retains its value whether the purchaser plays a game or does not play a game.

5. Persons entering the Defendant's premises can play the computer-generated games once every twenty-four hours without the purchase of anything.

6. Defendant operates a grocery store next to the Players Club Café in which phone cards, which have approximately the same value as the cards sold in the café, are sold at a kiosk.

7. The games that are played on the computer are games in which the winner of any such game has been predetermined by a computer-generated system so that a purchaser could determine whether or not he was a winner instantly.

8. The Defendant claims that his business is a sweepstakes operation and, while the Court agrees that it has all the appearances of such a sweepstakes, the Court is not required to make that determination and the Court declines to do so.

## Conclusions of Law

In order to find the Defendant guilty of a violation of Ohio gambling laws, the Court must find that there is chance, prize and consideration.

1. The Court finds that the consideration is for the purchase of the phone card only and that that consideration is never in jeopardy.

2. That the element of risk is absent from this case inasmuch as the purchaser of the phone card risks nothing. If the purchaser does not win a prize,

14

he still retains the full purchase price of his phone card. There is the chance of a prize or a reward in the playing of the game.

3. The element of risk is missing. The element of consideration is, at best, compromised.

4. The claim of the State that the Court must look at the "predominate purpose of the machines" is not a criminal element and need not be addressed by this Court.

The Court finds the Defendant not guilty of gambling, a violation of Section 2915.02(A)(2), and, by necessity, not guilty of operating a gambling house, a violation of Section 2915.03(A)(1).

_/8 /November/ 0 ?_
Date

_[signature]_
Judge Francis X. Gorman