IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PJY ENTERPRISES, LLC, a Hawaii limited liability company, LUCKY G. ENTERPRISES, INC., a Hawaii corporation; SL&G INVESTMENTS, LLC; a Hawaii limited liability company, WZ WAIKIKI PARTNERS, LLC, a Hawaii limited liability company; WZ WAHIAWA PARTNERS, LLC, a Hawaii limited li, | ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL NO. 12-00577 LEK-KSC |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) ) | |
| KETIH M. KANESHIRO, in his official capacity as the Prosecuting Attorney of the City and County of Honolulu; LOUIS M. KEALOHA, in his official capacity as the Chief of Police of the City and County of Honolulu; HONOLULU POLICE DEPARTMENT; JOHN DOES 1-10; JANE DOES 1-10; and DOE GOVERNMENTAL ENTITIES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**ORDER DENYING (1) PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER; (2) PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION; AND (3) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before the Court are the following motions:

(1) Plaintiffs PJY Enterprises, LLC ("PJY"), Lucky G Enterprises,

Inc. ("Lucky G"), S L & G Investments, LLC ("S L & G"), WZ

Waikiki Partners, LLC ("WZ Waikiki"), WZ Wahiawa Partners, LLC

("WZ Wahiawa"), and PMG Entertainments, LLC's (collectively "Plaintiffs") Motion for Temporary Restraining Order and Motion for Preliminary Injunction ("Plaintiffs' Motions"), filed on November 1, 2012; and (2) Defendants Keith M. Kaneshiro, Louis M. Kealoha, and the Honolulu Police Department's ("HPD," all collectively "the City") Motion for Summary Judgment ("City Motion"), filed on December 19, 2012.

The City filed its memorandum in opposition to the Plaintiffs' Motions on November 20, 2012, Plaintiffs filed their reply on November 26, 2012, and the City filed a supplemental memorandum in opposition on December 3, 2012.  These matters came on for hearing on December 3 and 5, 2012.  Appearing on behalf of Plaintiffs was Keith Kiuchi, Esq., and appearing on behalf of the City were Ernest Nomura, Esq., and Kamilla Chan, Esq.  The Court heard testimony from: Dwayne Waxer, Clay Turner, John-Martin Meyer, April Whiting-Haraguchi, Kimberly Lee De Young, Jonathon Grems, Aaron Young, Tracy Yoshimura, Michael Scott, and Mark Yuen.  Following the hearing, the parties filed written closing arguments on December 12, 2012.

Plaintiffs filed their memorandum in opposition to the City's Motion on January 2, 2013, and the City filed its reply on January 8, 2013.  The Court finds the City's Motion suitable for disposition without a hearing pursuant to Rule LR7.2(d) of the Local Rules of Practice of the United States District Court for

the District of Hawai`i ("Local Rules").

After careful consideration of the motions, supporting and opposing memoranda, and the arguments of counsel and testimony at the hearing, the Plaintiffs' Motions are HEREBY DENIED and the City Motion is HEREBY DENIED for the reasons set forth below.

## BACKGROUND

Plaintiffs filed their Complaint on October 12, 2012 in the Circuit Court of the First Circuit, State of Hawai`i, seeking a declaratory judgment, injunctive relief, and monetary damages following the HPD's seizure of 77 Products Direct Sweepstakes terminals ("terminals" or "devices") from the game arcades operated by Lucky G, S L & G, WZ Waikiki, WZ Wahiawa, and PMG Entertainments.  The City removed the action to this Court on October 26, 2012, and Plaintiffs filed a First Amended Complaint on October 31, 2012.

Plaintiffs assert that the terminals are a legitimate promotion of a bona fide product in the form of discount coupons for a consumer products website.  According to Plaintiffs, the sweepstakes promotion operates as follows:

> b.   The customer walks up to the PRODUCTS DIRECT® SWEEPSTAKES terminal, and inserts paper money into the bill acceptor.
> c.   The PRODUCTS DIRECT® SWEEPSTAKES terminal prints out a discount coupon for the purchase of consumer product(s) to be purchased on an internet website from Products Direct.  The coupon is worth twice the value of the amount of

3

money inserted into the terminal and is subject to a cap of 30% discount for the purchase of these consumer products.

      d.   The customer can go online and redeem the coupon at www.redeemsite.com or at www.productsdirectwebsite.com. All of the accumulated discount coupon values purchased and redeemed by a customer are maintained and saved in an account which is set up for each and every customer. All discount values accumulated in a customer's account remain valid for 90 days after the ending date of the Sweepstakes. . . .

      e.   In connection with the purchase of the discount coupon, the customer receives free entries into the sweepstakes. The customer can play one of several "fun" games to reveal whether they have won anything or they can instantly find out by selecting the "Reveal Instant Winners" button. The customer is not required to play any of the "fun" games to see if he or she has won. The various "fun" games on the terminals, as well as the "Reveal Instant Winners" button, merely function as the "revealing mechanisms", or "methods" to reveal what the customer has won with their entry or entries. In the case of the PRODUCTS DIRECT® SWEEPSTAKES entries, the consumer chooses one of the "fun" games, or the "Reveal Instant Winners" button to see whether or not an entry is a "winner"; and if it is a "winner", to see what the value of that "winning" entry is. . . .

      f.   Instead of purchasing a discount coupon, a customer can enter the sweepstakes without a purchase. A customer can follow the instructions on the terminal screen (or the posted written rules) and write in for a free entry code. Upon receipt of the free entry code, the customer must return to the same terminal from which the "request for a free entry code" was made, and type in the code to redeem his or her "free entries". This requirement ensures that the customer's entries come from the "same pool" from which he/she had requested the free entry. Upon entering the code, the customer received 100 free entries to play the sweepstakes. Each such entry has the same chance of winning as an entry obtained in connection with the purchase of a discount coupon.

4

[Decl. of Tracy Yoshimura, filed 11/1/12 ("11/1/12 Yoshimura Decl.").]

Plaintiffs allege that, on September 27, 2012, the City directed and conducted the seizure pursuant to a search warrant issued by the District Court of the First Circuit, Honolulu Division in S.W. 2012-238.  On September 28, 2012, Mr. Kaneshiro, the Prosecuting Attorney, stated at a press conference that: "Citizens are put on notice that these are gambling machines and gambling is illegal in Hawaii."  [Id. at ¶ 6.]  To date, the City has not commenced criminal or forfeiture proceedings in connection with the terminals, but has retained possession of them.

Plaintiffs seek: (1) a declaratory judgment that the devices do not violate the gambling laws of the State of Hawai'i, Haw. Rev. Stat. §§ 712-1222 and 712-1226, and that their seizure violated various rights guaranteed by the Constitutions of the United States and State of Hawai'i [First Amended Complaint ¶¶ 22-25]; (2) injunctive relief in the form of a temporary restraining order and preliminary injunction prohibiting future seizure of Plaintiffs' terminals or further infringement of their rights [id. at ¶¶ 27-29]; and (3) monetary damages [id. at ¶¶ 31-33].

I.   **City Motion**

The City asks the Court to dismiss Plaintiffs' claims

on the ground that the case is not justiciable because "the Hawaii criminal [court] should first ultimately decide the issue of whether the search warrant involved in this case was issued without probable cause[.]" [City Motion at 2.]  The City states that it is not raising abstention pursuant to Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941), but challenging whether the case is justiciable or ripe in the first instance. [Mem. in Supp. of City Motion at 2 n.1.]

        The City notes that Plaintiffs have not attacked the legality of the underlying search warrant that supported HPD's seizure of the devices.  The City argues that Haw. R. Pen. P. 41 provides a method for an aggrieved person to challenge the validity of the warrant, move to have the property returned, and to suppress the evidence should it be determined that the warrant was issued without probable cause.  It argues that, until the search warrant is successfully challenged under Haw. R. Pen. P. 41, the warrant is presumptively valid and cannot form the basis for the instant civil case, and therefore, the case is not ripe.  [Id. at 6-9.]

        The City also argues that PJY lacks standing to assert constitutional violations regarding the seizure and retention of the devices because it has no ownership interest in the property. According to the City, Mr. Yoshimura, the sole managing member of PJY, admitted that PJY has no ownership interest in the devices

6

or any ownership interest in any of the other five LLC Plaintiffs.  It notes that PJY is only the distributor of the devices, and does not have standing to assert constitutional violations arising out of the seizure and retention of the devices.  [Id. at 9.]

A.    **Plaintiffs' Opposition**

In their opposition, Plaintiffs acknowledge that they have not filed any Haw. R. Pen. P. 41(e) proceeding in state court, but assert that Rule 41(e) is not mandatory in its language, and they need not exhaust that remedy before seeking other remedies.  They contend that they seek more than the simple return of property.  [Mem. in Opp. to City Mot. at 2, 6.]  They argue that, although the City claims a state criminal court should decide whether the warrants were lawfully issued, the City has refused to produce the supporting affidavits in order to allow a court to make such a decision.  [Id. at 4.]  Plaintiffs maintain that this case is ripe because, following the seizure, the Prosecuting Attorney proclaimed that they were illegal gambling machines and promised prosecution; Plaintiffs assert that they remain under threat of prosecution.  [Id. at 10.]

PJY proffers that its sole source of income is from the sale of the terminals and "fills" for the terminals to customers in the State, and that, if the use of the terminals is eliminated, it would put PJY out of business.  [Id. at 3.]  It

7

argues that its income "is its property," and that a "business, calling or profession is a property right." [Id. at 11.] PJY also asserts a liberty interest and a state constitutional right "to enjoy the acquisition and possession of property." [Id. at 13.]

**B.** **The City's Reply**

The City argues that Plaintiffs are not engaged in any constitutionally protected activity. It also argues that, because the devices have already been seized, Plaintiffs are not seeking a preenforcement ruling that clarifies whether engaging in future conduct violates the law. According to the City, Plaintiffs should not be permitted to seek the return of evidence while the criminal investigation is ongoing, or challenge the validity of a search warrant in a federal civil case. [Reply in Supp. of City Mot. at 3-4, 6-7.]

The City maintains that PJY does not have Article III standing because it does not have any ownership interest or rights in the terminals. To the extent it has a right to an income stream based on "fills," the City argues that PJY's rights are derivative given the types of claims being asserted, and that none of the constitutional claims apply to the distributor of the devices. [Id. at 7-8.]

**II.** **Plaintiffs' Motions**

8

A.    **Plaintiffs' Arguments**

In their Motions, Plaintiffs seek an order prohibiting the City from seizing the terminals owned and distributed by Plaintiffs, from interfering in the Plaintiffs' operation and distribution of the terminals, and from infringing upon Plaintiffs' constitutional rights.  Plaintiffs argue that they have demonstrated serious questions on the merits of their claims that the terminals do not violate state gambling statutes. [Plaintiffs' Closing Br. at 4-8.]  They maintain that the Products Direct company has over 4,000 user accounts and over $4,711,000 worth of coupons deposited into those accounts, and that its sweepstakes promotion has been very successful.  [Id. at 7-8 (citing Decl. of Dwayne Waxer ("Waxer Decl."), at ¶ 31).] Plaintiffs point to several South Carolina magistrate court decisions upholding the legality of the same terminals at issue in the instant case.  [Id. at 9-10.]

Plaintiffs argue that they have suffered irreparable harm because they have suffered deprivations of constitutional rights, and injury to goodwill and business reputation. They argue that the seizure of all the devices was unreasonable, and that the City is attempting to shut down Plaintiffs' business by retaining the terminals without due process.  [Id. at 12-19.]

B.    **The City's Arguments**

The City argues that Plaintiffs have not met their

9

burden for the grant of preliminary injunctive relief.  [The City's Closing Br. at 4-8.]  It argues that Plaintiffs have not suffered any irreparable injury, and that all of Plaintiffs' claims can be remedied with compensatory damages.  [Id. at 4-6.] With respect to Plaintiffs' likelihood of success on the merits, the City argues that there is no evidence of any constitutional violations, and that holding evidence during a pending criminal investigation does not infringe upon any law or right.  The City maintains that the terminals are "gambling devices" under state law.  [Id. at 7-14.]

According to the City, the balance of equities does not tip in Plaintiffs' favor, and if such devices are permitted in the state, gambling device manufacturers could attached a bona fide product to a slot machine and term it a sweepstakes machine. It also argues that granting preliminary injunctive relief is not in the public interest because of the State's prohibition against all forms of gambling.  [Id. at 27-29.]

**DISCUSSION**

**I.   City Motion**

The Court construes the City Motion as a motion to dismiss for lack of subject matter jurisdiction.  See Chandler v. State Farm Mut. Auto. Ins. Co., 598 F.3d 1115, 1122 (9th Cir. 2010) ("Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule

12(b)(1) motion to dismiss.").

**A.  Ripeness**

The doctrine of ripeness, a subset of justiciability, concerns "the appropriate timing of judicial intervention." Renne v. Geary, 501 U.S. 312, 320 (1991).  One timing concern is "whether the harm asserted has matured sufficiently to warrant judicial intervention."  Warth v. Seldin, 422 U.S. 490, 499 (1975).  More specifically, the Court's concern is "'whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Chandler, 598 F.3d at 1122–23 (citing Richardson v. City and County of Honolulu, 124 F.3d 1150, 1160 (9th Cir. 1997)).

Ripeness has two components: constitutional ripeness and prudential ripeness.  Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc).  "The constitutional ripeness of a declaratory judgment action depends upon 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" United States v. Braren, 338 F.3d 971, 975 (9th Cir. 2003) (quoting Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273, (1941)).  The issues presented must be "definite and concrete, not hypothetical or abstract."  Thomas, 220 F.3d at 1139

(internal quotation marks omitted).  Where a dispute hangs on "future contingencies that may or may not occur," Clinton v. Acequia, Inc., 94 F.3d 568, 572 (9th Cir. 1996), it may be too "impermissibly speculative" to present a justiciable controversy. Portland Police Ass'n v. City of Portland, 658 F.2d 1272, 1273 (9th Cir. 1981).  "The constitutional component of ripeness is a jurisdictional prerequisite."  United States v. Antelope, 395 F.3d 1128, 1132 (9th Cir. 2005).

With respect to constitutional ripeness, the Court concludes that the present controversy is definite and concrete, not hypothetical or abstract.  The instant case does not appear to be a pre-enforcement challenge;[1] rather, the City has already seized the devices pursuant to state law and refuses to return them to Plaintiffs.  On the other hand, while a criminal investigation appears to be ongoing, Plaintiffs have not yet been charged with a crime.  Constitutional standing and ripeness are not met by "the mere existence of a proscriptive statute [or] a generalized threat of prosecution."  Thomas, 220 F.3d at 1139

---

[1] In pre-enforcement cases evaluating whether plaintiffs are subject to a genuine threat of imminent prosecution, courts consider: (1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question"; (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," and (3) "the history of past prosecution or enforcement under the challenged statute." Thomas, 220 F.3d at 1139; see also Stormans, Inc. v. Selecky, 586 F.3d 1109, 1123 (9th Cir. 2009).  Here, it appears that Plaintiffs are subject to a genuine threat of imminent prosecution, based on the current record.

(citing San Diego County Gun Rights Comm. v. Reno, 98 F.3d 1121, 1126-27 (9th Cir. 1996).  Such is not the case here.  It does not appear that the case is anchored to future events that may not occur as anticipated.  See Erwin Chemerinsky, Federal Jurisdiction § 2.4.1 (5th ed. 2007) ("Specifically, the ripeness doctrine seeks to separate matters that are premature for review because the injury is speculative and may never occur, from those cases that are appropriate for federal court action.").  The Court finds that Plaintiffs' alleged injury is not too speculative or hypothetical to make review premature at this time.

The Court next turns to the prudential portion of the ripeness analysis.  "In evaluating the prudential aspects of ripeness, our analysis is guided by two overarching considerations: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  Thomas, 220 F.3d at 1141 (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967)).  As discussed above, the Court finds that this dispute does not rely on contingent, future events.  "A question is fit for decision when it can be decided without considering 'contingent future events that may or may not occur as anticipated, or indeed may not occur at all.'"  Addington v. U.S. Airline Pilots Ass'n, 606 F.3d 1174, 1179 (9th Cir. 2010) (quoting Cardenas v. Anzai, 311

F.3d 929, 934 (9th Cir. 2002)).  "To meet the hardship requirement, a litigant must show that withholding review would result in 'direct and immediate' hardship and would entail more than possible financial loss."  Winter v. Cal. Med. Review Bd., Inc., 900 F.2d 1322, 1325 (9th Cir. 1990) (citing Cal. Dep't of Educ. v. Bennett, 833 F.2d 827, 833-34 (9th Cir. 1987)).  On balance, the Court finds that this factor does not weigh against review under the circumstances.  Plaintiffs have made a sufficient showing with respect to the prudential ripeness inquiry.

To the extent the City's ripeness argument hinges on the availability of a Haw. R. Pen. P. 41(e) proceeding, the Court is not convinced.  That provision allows for the filing of a motion to return property, as follows:

> A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move the court having jurisdiction to try the offense for the return of the property. The judge shall receive evidence on any issue of fact necessary to the decision of the motion.  If the motion is granted, the property shall be returned unless otherwise subject to lawful detention, but the judge may impose reasonable conditions to protect access to the property and its use in later proceedings.

Haw. R. Pen. P. 41(e).  The plain language of the rule does not require Plaintiffs to file such a motion as an original state court proceeding or otherwise deprive this Court of jurisdiction to entertain Plaintiffs' request for declaratory and injunctive

14

relief.  Moreover, the rule does not alter the Court's analysis regarding whether the matter is ripe or fit for review.  In sum, the Court concludes that the instant matter is sufficiently ripe and that subject matter jurisdiction exists.  The City Motion is DENIED with respect to its ripeness argument.

   **B.**   **Standing**

   The Court next turns to the City's claim that PJY lacks standing to pursue this matter.  Under the constitutional standing inquiry, the Court examines whether Plaintiffs satisfy the "case or controversy" requirement of Article III.  A party "must show (1) it has suffered 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of Earth, Inc, v. Laidlaw Envtl. Services (TOC), Inc., 528 U.S. 167, 180–81 (2000).

   PJY meets this standard here.  Although PJY does not own the seized devices, it distributes the devices within the state and sells "fills" to its arcade customers, which are necessary for the devices to operate.  Further, Mr. Yoshimura testified that he is involved in the development of a coupon book and working on additional product availability to increase sales at the Products Direct website.  Whether PJY has a sufficient

liberty or property interest to sustain a due process claim is a separate issue.  "Standing merely requires a redressable injury that is fairly traceable to [a defendant's] conduct.  Whether a plaintiff can recover for that injury under a particular theory of liability is a separate question."  In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, Products Liability Litigation, 754 F. Supp. 2d 1145, 1161 (C.D. Cal. 2010); see also Denney v. Deutsche Bank AG, 443 F.3d 253, 263-64 (2d Cir. 2006) ("[A]n injury-in-fact differs from a 'legal interest'; an injury-in-fact need not be capable of sustaining a valid cause of action under applicable tort law.  An injury-in-fact may simply be the fear or anxiety of future harm.").  For Article III standing purposes, the Court concludes that PJY alleges a sufficient injury-in-fact.  The Motion is DENIED with respect to the City's challenge to PJY's Article III standing.

Having denied the City's Motion, and finding that it has subject matter jurisdiction over the instant matter, the Court turns to the substance of Plaintiffs' request for a preliminary injunction.

## II.  PJY Motions

### A.  Standard

In general, the standard for a temporary restraining order or a preliminary injunction is as follows:

16

"[I]njunctive relief is an extraordinary
remedy that may only be awarded upon a clear
showing that the plaintiff is entitled to such
relief." <u>Winter v. Natural Res. Def. Council,
Inc.</u>, 129 S. Ct. 365, 376 (2008).  The standard
for granting a preliminary injunction and the
standard for granting a temporary restraining
order are identical.  <u>See</u> <u>Haw. Cnty. Green Party
v. Clinton</u>, 980 F. Supp. 1160, 1164 (D. Haw.
1997); Fed. R. Civ. P. 65.

<u>Sakala v. BAC Home Loans Servicing, LP</u>, CV. No. 10-00578 DAE-LEK,

2011 WL 719482, at *4 (D. Hawai`i Feb. 22, 2011) (alteration in

original).

A plaintiff seeking a preliminary injunction
must establish that he is likely to succeed on the
merits, that he is likely to suffer irreparable
harm in the absence of preliminary relief, that
the balance of equities tips in his favor, and
that an injunction is in the public interest.  <u>Am.
Trucking Ass'ns v. City of Los Angeles</u>, 559 F.3d
1046, 1052 (9th Cir. 2009) (quoting <u>Winter v.
Natural Res. Def. Council, Inc.</u>, --- U.S. ----,
129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008))
(explaining that, "[t]o the extent that [the Ninth
Circuit's] cases have suggested a lesser standard,
they are no longer controlling, or even viable"
(footnote omitted)); <u>see also</u> <u>Winter</u>, 129 S. Ct.
at 374-76 (holding that, even where a likelihood
of success on the merits is established, a mere
"possibility" of irreparable injury is
insufficient to warrant preliminary injunctive
relief, because "[i]ssuing a preliminary
injunction based only on a possibility of
irreparable harm is inconsistent with [the Supreme
Court's] characterization of injunctive relief as
an extraordinary remedy that may only be awarded
upon a clear showing that the plaintiff is
entitled to such relief").

<u>Painsolvers, Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 685 F. Supp.

2d 1123, 1128-29 (D. Hawai`i 2010) (footnote and some citations

omitted) (alterations in <u>Painsolvers</u>).  The Ninth Circuit has

17

held that its "serious questions" version of the sliding scale test for preliminary injunctions[2] survives <u>Winter</u> to the extent that a court may grant a preliminary injunction where the plaintiff (1) "demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor[,]" and (2) satisfies the other <u>Winter</u> factors, likelihood of irreparable injury and that the injunction is in the public interest.   <u>Alliance for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (citation and block quote format omitted) (some alterations in original).

**A.   <u>Likelihood of Success</u>**

As the party seeking an injunction, Plaintiffs have the

---

[2] The Ninth Circuit has stated the sliding scale test as follows:

> "A preliminary injunction is appropriate when a plaintiff demonstrates 'either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor.'" <u>Lands Council v. Martin (Lands Council II)</u>, 479 F.3d 636, 639 (9th Cir. 2007) (quoting <u>Clear Channel Outdoor Inc. v. City of Los Angeles</u>, 340 F.3d 810, 813 (9th Cir. 2003)).  These two options represent extremes on a single continuum: "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." <u>Id.</u>

<u>Lands Council v. McNair</u>, 537 F.3d 981, 987 (9th. Cir. 2008) (en banc) (some citations and internal quotation marks omitted) (alteration in original).

burden to establish a likelihood of success on the merits.

Plaintiffs allege violations of their constitutional due process

rights and free speech rights, and illegal search and seizure.

The City denies violating Plaintiffs' rights under the federal

and state constitutions, and contends that the terminals are

prohibited "gambling devices" under state law.

A "gambling device" means "any device, machine,

paraphernalia, or equipment that is used or usable in the playing

phases of any gambling activity, whether that activity consists

of gambling between persons or gambling by a person involving the

playing of a machine." Haw. Rev. Stat. § 712-1220(5). Under

Haw. Rev. Stat. § 712-1220, "gambling" is defined as follows:

> A person engages in gambling if he stakes or risks
> something of value upon the outcome of a contest
> of chance or a future contingent event not under
> his control or influence, upon an agreement or
> understanding that he or someone else will receive
> something of value in the event of a certain
> outcome. Gambling does not include bona fide
> business transactions valid under the law of
> contracts, including but not limited to contracts
> for the purchase or sale at a future date of
> securities or commodities, and agreements to
> compensate for loss caused by the happening of
> chance, including but not limited to contracts of
> indemnity or guaranty and life, health, or
> accident insurance.

Haw. Rev. Stat. § 712-1220(4). "'Something of value' means any

money or property, any token, object, or article exchangeable for

money or property, or any form of credit or promise directly or

indirectly contemplating transfer of money or property or of any

interest therein, or involving extension of a service or entertainment." Haw. Rev. Stat. § 712-1220(11).

Based on the current record before the Court, the devices at issue appear to fall within the ambit of Haw. Rev. Stat. § 712-1220(5). The evidence shows that the devices operate as "games of chance" and that players have the opportunity to win or "receive something of value." The parties hotly dispute whether "something of value" is "staked or risked." Plaintiffs and the device manufacturers contend that the money that players insert into the terminals is to purchase Products Direct discount coupons, and not to play games of chance. The evidence, however, appears to indicate that the sweepstakes "entries" that the player gets upon inserting money into the devices are "something of value" that give the player the ability to play the games of chance such as Poker, Bingo, Keno, Black Jack, and Jacks or Better. HPD Detective Aaron Young testified at the hearing as follows, in response to questioning from the Court:

> Once you purchase the coupon, ma'am, it's up to you. You can hold the coupon or some guys just let it keep piling down like a string. You can either reveal your sweepstakes entries one of two ways by revealing it instan[t] winners or by playing any of the fun casino games available on that terminal. Fun casino games ranges as depends on that terminal. It could be Bingo, Keno, Black Jack, and Poker. So when you use your entries that you are awarded, you use those entries similar, in my opinion, as credits or wagers in allotments that you -- like for example, going back to the 2,000 entries, you could use it as 100, 200, 300 entries until you expended those

entries.
       If you accumulate winning credits on the
casino type games, it will show up in another
section called wins and a dollar sign amount.  So
for instance, 2,000 entries, I am going to use a
hundred entries on one game hand, say, Poker.  The
entry section is now going to say 1900.  I am
going play the game, Draw Poker, similar to like
Draw Poker in Vegas.  If I get winning cash
accumulating, that is dependent on the pay table
and on the game.  And if I elect to take the
score, I will get cash winnings, and it will say
wins, whatever, according to the pay table.  Once
you expend all of your entries, you can either use
those entries to buy more coupons or you can elect
to cash out.  When you elect to cash out, you
touch the ticket button.  It will dispense
tickets.  You take it to the cash attendants or
registered worker, and they will pay up cash as
respective to what's printed on the ticket.

[12/3/12 Tr. at 115-16.]

       Significantly, the entries appear to have value, as

they allow a player to wager the entries to "double up" his or

her winnings; as the player "doubles up," he or she risks winning

more depending on the amount of entries played, or can risk

losing the winnings.  According to Mr. Yoshimura, who discussed

the "double up" feature at the hearing while describing

Plaintiffs' Exhibit 51, a visual representation of how a specific

game screen appears, a player can designate how many entries he

or she would like to wager and can increase earnings.

       Q.   Okay.  So assume, if you will, that I -- you
       decided to double up.  You are doubling the what?

       A.   The score that's in the box right there right
       now.

       Q.   600; correct?

A. Correct.

Q.  And so I would double up.  If I won the double up game, I could double it up to 1200?

A.   Correct.

Q.   Correct?   Translated to $12?

A.   Correct.

Q.   And then actually the double up feature, you can double up in a particular game three times; correct?

A.   Correct.

Q.   And so if I win the first double up, I get $12; correct?

A.   Correct.

Q.   And then if I play double up again, I can double it up to $24?

A.   Correct.

      . . . .

Q.   But if I -- if I lose a third double up, I lose everything?

A.   Correct.

[12/5/12 Tr. at 14-15.]

        Mr. Yoshimura also explained that the "instant reveal"
feature is independent of the game's "take score" feature, which
is based on the hand of cards dealt to a player.  [12/5/12 Tr. at
33-34.]  Although the Court has not conducted an exhaustive
inquiry into the operation of all the games offered on the
terminals, the record supports a preliminary finding that the

terminals can operate as "gambling devices."  In light of the nature of the terminals, the Court cannot say that Plaintiffs have made a strong showing of likely success on the merits of their constitutional claims.

To the extent Plaintiffs allege a First Amendment violation, there is no constitutionally protected right to operate a gambling enterprise.  Nevada Rest. Servs., Inc. v. Clark Cnty., Nos. 2:11-CV-00795-KJD, 2:11-CV-00824-KJD, 2012 WL 4355549, at *7 (D. Nev. Sept. 21, 2012) ("[G]overnments have expansive authority in relation to gambling because it implicates no constitutionally protected right and is a 'vice' activity that can be 'banned altogether.'") (citing United States v. Edge Broadcasting Co., 509 U.S. 418 (1993)).  With respect to their due process and search and seizure claims, Plaintiffs have not established a high likelihood of success.  Plaintiffs have not presented sufficient evidence that they have been denied due process or that the search or seizure violated any constitutional prohibition.  The Court concludes at this point in the litigation, that Plaintiffs have not established a high likelihood of success on the merits.

B.  **Irreparable Harm**

Here, Plaintiffs' alleged losses are generally monetary in nature.  Typically, monetary harm does not constitute irreparable harm.  Los Angeles Mem'l Coliseum Comm'n v. Nat'l

<u>Football League</u>, 634 F.2d 1197, 1202 (9th Cir. 1980).  This is so because "economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award."  <u>Cal. Pharmacists Ass'n v. Maxwell-Jolly</u>, 563 F.3d 847, 852 (9th Cir. 2009).  The Court is mindful that "[s]peculative injury cannot be the basis for a finding of irreparable harm." <u>In re Excel Innovations, Inc.</u>, 502 F.3d 1086, 1098 (9th Cir. 2007) (citation omitted).  Plaintiffs' likely monetary harm therefore does not constitute irreparable harm for purposes of an injunction.  Moreover, Ms. Whiting-Hariguchi acknowledged at the hearing that the WZ arcade entities did not and would not suffer any harm as a result of the seizures.  Instead, the seized devices were replaced by other sweepstakes devices.  [12/3/12 Tr. at 85-88.]

       PJY makes a more compelling case for irreparable harm, arguing that it has suffered a loss of goodwill and business reputation.  This Court has recognized that, "'[a]lthough the loss of goodwill and reputation are important considerations in determining the existence of irreparable injury, there must be credible and admissible evidence that such damage threatens Plaintiff's businesses with termination.'"  <u>Am. Promotional Events, Inc.--Nw. v. City & Cnty. of Honolulu</u>, 796 F. Supp. 2d 1261, 1283-84 (D. Hawai`i 2011) (quoting <u>Dotster, Inc. v. Internet Corp. for Assigned Names & Nos.</u>, 296 F. Supp. 2d 1159,

1163-64 (C.D. Cal. 2003)).  It is questionable here whether PJY

has alleged the kinds of harm that are irreparable, and it

appears to the Court that PJY's harm is primarily monetary.

> Ordinarily, lost revenue does not establish
> irreparable harm.  Los Angeles Memorial Coliseum
> Comm'n v. NFL, 634 F.2d 1197, 1202 (9th Cir.
> 1980).  Similarly, courts have denied injunctive
> relief where the facts disclose that loss of
> business goodwill can be remedied by money
> damages.  See id. at 1202 (evidence of loss of
> revenue, property value, and goodwill did not
> establish irreparable harm); see also OG Int'l,
> Ltd. v. Ubisoft Entm't, C 11-04980 CRB, 2011 WL
> 5079552, at *10 (N.D. Cal. Oct. 26, 2012) (finding
> in trademark action that customers and business
> goodwill "at least in theory may be compensated by
> damages" and therefore weigh against a claim of
> irreparable harm).

Drakes Bay Oyster Co. v. Salazar, No. 12-cv-06134-YGR, 2013 WL

451860, at *17 (N.D. Cal. Feb. 4, 2013).

In any event, assuming PJY did establish a sufficient

and definite loss of goodwill, a finding of irreparable harm

alone would not justify the grant of injunctive relief under the

unique facts and circumstances of this case.

C.     **Balance of the Equities**

To determine which way the balance of the hardships

tips, a court must consider the possible harm caused by the

preliminary injunction against the possibility of the harm caused

by not issuing it.  Univ. of Hawai`i Prof'l Assembly v. Cayetano,

183 F.3d 1096, 1108 (9th Cir. 1999).  Having considered the

parties' arguments regarding the balance of hardships in the

instant matter, the Court finds that the balance of equities does not tip in Plaintiffs' favor.

D.   **Public Interest**

This Court has recognized the following principles relevant to the public interest inquiry:

> The plaintiffs bear the initial burden of showing that the injunction is in the public interest.  See Winter [v. Natural Resources Defense Council, Inc.], [555 U.S. 7,] 129 S. Ct. [365,] 378 [(2008)].  However, the district court need not consider public consequences that are "highly speculative." In other words, the court should weigh the public interest in light of the likely consequences of the injunction.  Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence.

> Finally, the district court should give due weight to the serious consideration of the public interest in this case that has already been undertaken by the responsible state officials . . . who unanimously passed the rules that are the subject of this appeal.  See Golden Gate Rest. Ass'n [v. City and County of San Francisco], 512 F.3d [1112] at 1127 [(9th Cir. 2008)] ("The public interest may be declared in the form of a statute." (internal quotation marks omitted)); see also Burford v. Sun Oil Co., 319 U.S. 315, 318, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (internal quotation marks omitted)).

> Stormans, Inc. v. Selecky, 586 F.3d 1109, 1139–40 (9th Cir. 2009) (some citations and quotation marks omitted).  The public interest inquiry primarily addresses the impact on non-parties

rather than parties.

Am. Promotional Events, 796 F. Supp. 2d at 1284-85 (alterations
in Am. Promotional Events).  Here, the Court FINDS that the
public interest factor is neutral, and does not weigh in favor of
granting the injunction.

> **E.**    **Summary**

In sum, the Court concludes, at this stage of the case,
that Plaintiffs have not established serious questions going to
the merits nor that the balance of hardships tips sharply in
their favor.  See Alliance for the Wild Rockies, 632 F.3d at
1134-35.  Having found that none of the Winter factors weigh in
favor of granting the injunction, this Court HEREBY DENIES
Plaintiffs' Motions.

**CONCLUSION**

On the basis of the foregoing, the Court HEREBY
DENIES Plaintiffs' Motion for Temporary Restraining Order and
Motion for Preliminary Injunction, filed on November 1, 2012, and
also DENIES the City's Motion for Summary Judgment, filed on
December 19, 2012.

IT IS SO ORDERED.

27

DATED AT HONOLULU, HAWAII, February 28, 2013.



/S/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

PJY ENTERPRISES, LLC V. KEITH KANESHIRO, ETC., ET AL.; CIVIL NO. 12-00577 LEK-KSC; ORDER DENYING (1) PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER; (2) PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; AND (3) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT